IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KCK PROFESSIONAL FIREFIGHTERS
ASSOCIATION, IAFF LOCAL 64,

     Plaintiff,

    v.

UNIFIED GOVERNMENT OF
WYANDOTTE COUNTY
AND KANSAS CITY, KANSAS, and

UG BOARD OF COMMISSIONERS,

     Defendants.

CIVIL ACTION NO. 26-CV-02457

## MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff KCK Professional Firefighters Association, International Association of Fire Fighters Local 64 ("Union" or "Local 64") brings this action to vindicate the First and Fourteenth Amendment rights of its members to speak with their elected officials regarding a matter of paramount public concern: the inability of the Kansas City Kansas Fire Department ("KCKFD") to safely and effectively respond to emergencies due to inadequate staffing of personnel on its emergency vehicles.

In April 2026, the Unified Government of Wyandotte County and Kansas City, Kansas ("the UG") promulgated, and has to date continued to strictly enforce, a policy which prohibits the Union and its members from addressing their elected officials directly or at publicly accessible meetings of the Board of Commissioners regarding this matter. If allowed to continue, enforcement of this transparently unconstitutional policy will cause irreparable harm to the Union, its members, and the public. As such, Plaintiff respectfully requests that this Court grant a temporary restraining order ("TRO") and a preliminary injunction enjoining Defendants from enforcing the policy.

**STATEMENT OF FACTS**

In January 2025, as part of a plan to implement a one-year revenue neutral budget, the UG reduced the number of fighter fighters manning its ladder trucks and other specialty apparatus from four – the National Fire Protection Association ("NFPA") standard – to three. Declaration of John J. Simma ¶ 3. In July 2025, the Union's Executive Board sent a letter to the Mayor and the Board of Commissioners in advance of the UG's discussion on whether to extend the revenue neutral budget beyond December 31, 2025, the date on which it was set to expire. *Id.* ¶ 4. In this letter, the Executive Board expressed its concerns about the lack of critical turnout gear and access to annual cancer screenings for fire fighters, dismal fire station conditions, and the reduction of staff on ladder trucks. *Id.* ¶ 5. The July 2025 letter highlighted that these issues posed serious risks to the safety of Kansas City fire fighters as well as to the public. *Id.*

On December 29, 2025, four Kansas City fire fighters were seriously injured during a structure fire collapse. *Id.* ¶ 6. The National Institute for Occupational Safety and Health ("NIOSH") later determined that inadequate staffing on the responding apparatuses contributed to the fire fighters' injuries. *Id.* ¶ 7. In a written report, NIOSH specifically noted that "NFPA 1750 states that both engine and truck companies should be staffed with a minimum of four on-duty personnel," and that "Staffing pumpers with four personnel, per NFPA 1750, may have allowed for a second firefighter to be prepared to assist in advancing" a second line of attack against the fire. *Id.* It accordingly recommended that KCKFD ensure adequate staffing is available to respond to emergency incidents. *Id.*

The UG Board of Commissioners ultimately decided not to extend the revenue neutral budget beyond December 31, 2025. *Id.* ¶ 8. However, despite awareness of the concerns outlined in the Union's July 2025 letter and the December 29, 2025 floor collapse incident, the UG did not allocate funds to increase staffing levels back up to four fire fighters per apparatus. *Id.*

2

Accordingly, in February and again in March 2026, Local 64 sent correspondence to the Mayor and Board of Commissioners reiterating its concerns about staffing levels. *Id.* ¶¶ 9, 11. In addition to this correspondence, the Union emailed the UG Clerk asking to be placed on the agenda for the March 16, 2026 Public Safety Committee meeting. *Id.* ¶ 10. The Union did not receive a response to its request to be placed on the agenda for the meeting. *Id.*

The Public Safety Committee is a standing committee of the UG's Board of Commissioners, and meetings of the Committee are held monthly. *Id.* ¶ 12. Pursuant to the Kansas Open Meetings Act ("KOMA"), K.S.A. § 75-4319, the Public Safety Committee meeting is open to the public. *Id.* Members of the public are permitted to submit comments via email ahead of the meeting, and those comments are read into the record at the meeting. Alternatively, members of the public may make comments before the Committee in person or virtually, as the meetings are streamed live on Zoom. *Id.* ¶ 13. Comments are limited to the subject of a given agenda item and disruptive comments are not permitted, but comments are not otherwise restricted. *Id.* ¶ 14. The UG expressly encourages the public to participate in committee meetings. *Id.* ¶ 13.

Nevertheless, on April 7, 2026, counsel for the UG, Ryan Denk, sent correspondence to the Union's counsel demanding that the Union cease communications with the Mayor and the Board of Commissioners. *Id.* ¶ 15. In this letter, Mr. Denk claimed that the Union violated Kansas's Public Employer Employee Relations Act ("PEERA"), Kan. Stat. Ann. § 75-4333(c)(2), by circumventing the UG's chosen bargaining representatives and communicating directly with the Commission regarding a subject of bargaining and threatened to subject the Union to legal action should these communications continue. *Id.* ¶ 16. The Union was not negotiating with the UG or KCKFD at the time the Union requested to speak to the Public Safety Committee. *Id.* ¶ 17. In fact, the Union and the UG are parties to a Memorandum of Agreement that is in effect until December

31, 2027. *Id.* Accordingly, the Union's counsel promptly responded to Mr. Denk's letter, advising him that the Union's communications with the UG did not violate PEERA and are in fact protected speech under the First Amendment. *Id.* ¶ 18.

On May 11, Local 64 President John Simma emailed the UG Clerk once again asking that the Union be placed on the agenda for the May Public Safety Committee meeting. *Id.* ¶ 19. The following day, Mr. Denk sent correspondence to counsel for Local 64 reiterating the UG's position that the Union's communications with elected officials violate PEERA and that any discussions regarding staffing decisions must take place as part of the meet and confer process with the UG's chosen bargaining representatives. *Id.* ¶ 20. On the advice of Mr. Denk, by email dated May 14, UG Commissioner Andrew Kump, the Chair of the Public Safety Committee, denied the Union's request to speak before the Public Safety Committee due to the "risk of disclosing potentially privileged/private matters in a public meeting and the ongoing discussions between the Union and the UG." *Id.* ¶ 21. He did not explain what "privileged/private matters" that the Union could possibly disclose or why "the ongoing discussion between the Union and the UG" prevented the Union from speaking at a publicly accessible meeting. *See id.*

The UG has begun its budget approval process for the 2027 fiscal year and is set to finalize the budget on September 1, 2026. *Id.* ¶ 22. The next Public Safety Committee meeting, and the last one before the budget is finalized, is scheduled for August 17, 2026. *Id.* Enforcement of Defendants' unlawful policy has resulted in the Union being effectively barred from addressing issues of substantial concern to the public with elected officials and advocating for a budget that addresses major, well-documented safety concerns affecting the KCKFD and members of the public.

4

## APPLICABLE STANDARDS

Federal Rule of Civil Procedure 65 establishes the relevant procedures for the granting of a preliminary injunction and a TRO. The standard for granting a preliminary injunction and a TRO is the same. *Winnebago Tribe of Nebraska v. Stovall*, 205 F. Supp. 2d 1217, 1221 (D. Kan. 2002). Four factors must be satisfied by the movant to obtain injunctive relief: (1) the movant is substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the movant's threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction is in the public interest. *First Baptist Church v. Kelly*, 455 F. Supp. 3d 1078, 1084 (D. Kan. 2020).

## ARGUMENT

I.      **Plaintiff is Substantially Likely to Succeed on the Merits of its Suit, and Plaintiff and its Members Will Suffer Irreparable Injury Unless Injunctive Relief is Granted.**

The Tenth Circuit applies a "liberal" standard for the "likelihood of success on the merits" requirement. *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980). Further, when a plaintiff asserts an injury in the form of a violated constitutional right, courts presume that the injury will be irreparable. *Ortega v. Grisham*, 148 F.4th 1134, 1142 (10th Cir. 2025) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). "The difficulty in calculating or determining adequate monetary damages for a constitutional injury is so well-settled that 'the principle collapses the first and second preliminary-injunction factors, equating likelihood of success on the merits with a demonstration of irreparable injury.'" *Id*.

Where a plaintiff brings a First Amendment claim, likelihood of success on the merits is "practically dispositive." *Wagner v. Bd. of Educ. USD 227 Hodgeman Cnty.*, Case No. 26-cv-1068, 2026 U.S. Dist. LEXIS 136961, at *2-3 (D. Kan. June 18, 2026). "In the First Amendment context, 'the likelihood of success on the merits will often be the determinative factor' because of the

5

seminal importance of the interests at stake." *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (quoting *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013)).

Here, the UG has violated the First Amendment rights of the Union and its members in two respects: 1) by imposing an impermissible prior restraint on their speech, and 2) by engaging in unlawful content-based discrimination. Plaintiff is likely to succeed on the merits of both claims, each of which is addressed in turn below.

### A.  Plaintiff is Likely to Succeed on the Merits of its Prior Restraint Claim.

It is well established that the government "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142 (1983). However, when the government acts as an employer, the First Amendment "does not apply with full force." *Horstkoetter v. Dep. of Pub. Safety*, 159 F.3d 1265, 1271 (10th Cir. 1998). Accordingly, the government may, in some circumstances, impose restraints on the speech of public employees. *U.S. v. Nat'l Treasury Emp.'s Union*, 513 U.S. 454, 465 (1995) ("NTEU"). In determining whether the public employer's restraint on speech is constitutional, courts must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Ed.*, 391 U.S. 563, 568 (1968).

Unlike in cases of an adverse employment action taken in response to speech already made, courts assessing the validity of a prior restraint on speech place a substantially higher burden on the government. Because a prior restraint chills potential speech before it happens, it is the "least tolerable infringement on the First Amendment," *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976), and is presumptively unconstitutional. *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 42

6

(10th Cir. 2013); *see also Dirks v. Bd. of Cnty. Comm'rs*, Case No. 15-cv-7997, 2016 U.S. Dist. LEXIS 68510, at \* (D. Kan. May 24, 2016) ("A prior restraint claim arises where such conduct is intended to 'chill' protected speech and the chilling effect is based on 'an objectively justified fear of real consequences.'") (quoting *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1182 (10th Cir. 2010)); *Czaplinski v. Ballard*, No. 25-2057, 2025 U.S. Dist. LEXIS 208890, 2025 WL 2986832, at \*4 (D. Kan. Oct. 23, 2025) (noting that the threat of litigation along with a ban would chill an ordinary person's speech).

The Supreme Court has held that the employer "must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of the Government." *NTEU*, 513 U.S. at 468; *see also Arndt v. Koby*, 309 F.3d 1247, 1251 (10th Cir. 2002). To satisfy this burden, the employer must show that the anticipated harms it seeks to prevent through a regulation on employee speech "are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *NTEU*, 513 U.S. at 475.

Despite this heightened burden, however, under the *Pickering/NTEU* test, a public employee challenging the constitutionality of a prior restraint on speech must satisfy the requirement that the particular speech at issue was on a matter of public concern. Generally, a matter of public concern relates to any matter of political, social, or other concern to the community. *Butler v. Bd. of Cty. Comm'rs for San Miguel Cty.*, 920 F.3d 651, 653 (10th Cir. 2019).

In the instant case, the UG has imposed a prior restraint on employee speech on a matter of public concern by denying the Union's request to speak before the Public Safety Committee and banning the Union from speaking at future Committee meetings or with members of the Board of Commissioners in general. The Union seeks to address the Committee and members of the

7

Board of Commissioners to raise concerns about the impact of inadequate staffing on fire fighter and public safety, which is indisputably a matter of public concern. *See Cooper v. Town of Bar Nunn*, 101 Fed. App'x. 324, 327 (10th Cir. 2004) (quoting *Lee v. Nicholl*, 197 F.3d 1291, 1296 (10th Cir. 1999)) ("[I]t is clearly established in this circuit that 'public employee speech alleging a danger to public health or safety is protected by the First Amendment.'"); *see also Velarde v. Rio Arriba Bd. of Cnty. Comm'rs*, No. CIV 01-0877, 2005 U.S. Dist. LEXIS 61656, at *21 (D.N.M. Apr. 1, 2005) ("Plaintiffs speaking out regarding the safety of the people of Velarde due to the condition of the Velarde Fire Department is undoubtedly speech relating to matters of public concern.").

Accordingly, the burden is on the UG to prove that the Union's speech poses a concrete harm to the operation of the actual government, and that preventing the Union from speaking will directly and materially alleviate that harm. But the UG cannot satisfy this lofty burden. The only justification the UG has articulated for imposing the speech restriction is its belief that the Union's speech violates PEERA. According to the UG, the Union may not speak directly with the Commission regarding a subject of bargaining and may only speak to the UG's chosen bargaining representatives. Relatedly, the UG bemoans the "risk of disclosing potentially privileged/private matters in a public meeting and the ongoing discussions between the Union and the UG." But these justifications are insufficient for at least three reasons: 1) the Union's speech does not violate PEERA, 2) the Union nonetheless has the right to speak with its elected officials even on matters that are or could be the subject of collective bargaining negotiations, and 3) the UG's concerns about the disclosure of privileged or private matters are speculative and baseless.

In its April 7, 2026 letter to the Union, the UG cites to *City of Junction City, Kansas v. Junction City Police Officers Assoc.*, PERB Case No. 75-CAEO-2-1992 (1992) for the proposition

8

that the Union's speech to the Commission about staffing violates PEERA. But this decision only held that the "bypassing of the [employer]'s chosen negotiations representative by [union] officials directly contacting [elected officials] **to discuss subjects under negotiation** constituted a violation of K.S.A. 72-5433(c)(2)." *Id*. at 61 (emphasis added). To the extent that any of the communications to elected officials sought by Local 64 officials in 2026 address mandatory subjects of bargaining, none of the communications are on issues that are under negotiation, as the parties are subject to a Memorandum of Agreement that is in effect until December 31, 2027. In other words, the parties are not currently in negotiations, so the Union has not violated PEERA.[1]

Regardless, PEERA aside, "a public employee has the constitutional right to address his employer at a public meeting even on matters then pending in collective bargaining negotiations." *Henrico Professional Fire Fighters Assoc. v. Bd. of Supervisors*, 649 F.3d 237, 242 (4th Cir. 1981) (citing *Madison Joint School Dist. v. Wisc. Emp. Relations Comm'n*, 429 U.S. 167 (1976)). The Supreme Court in *Madison* considered whether the Board of Education violated state labor law by permitting a nonunion teacher to speak at a public meeting, on behalf of himself and his fellow anti-union teachers, in opposition to a union shop clause, after the state Employment Relations Commission determined that such speech constituted "negotiations" with someone other than the exclusive bargaining agent. The Court held that even though the teacher spoke on a matter that was the subject of ongoing negotiations, he "addressed the school board not merely as one of its employees but also as a concerned citizen, seeking to express his views on an important decision of his government," and therefore that he, along with "other teachers and citizens (had) a protected

---

[1] As explained above, the Union is seeking to speak with its elected officials regarding the allocation of government funds for increased staffing on KCKFD emergency vehicles. Because budget appropriations are not a subject of bargaining between the Union and the UG, the UG's position that the Union's speech violates PEERA is even less tenable.

right to communicate with the board." *Madison*, 429 U.S. at 174-75, n.7. So too here, the members of the Union are also private citizens with legitimate interests in the efficient and safe operation of their fire department who seek to speak with their elected officials on important decisions of government, such as how much of the budget to allocate to the KCFD to hire first responders to respond to emergencies in the community.

Finally, the UG's position that the Union may not speak because of the risk that it will disclose "potentially privileged/private matters" is inherently speculative. While the UG may prohibit the Union from disclosing privileged matters, it may not issue a blanket prohibition on the Union's speech because it believes it *might* do so. *See NTEU*, 513 U.S. at 475.  This is especially the case where there does not appear to be privileged or private matters that the Union is seeking to disclose in advocating to elected officials to improve the staffing of the KCFD's emergency response vehicles.

At its core, the UG has imposed an *ex ante* restriction on the Union's private speech to elected officials on matters of public concern, using the threat of legal action to deter First Amendment protected speech without adequate justification. The UG cannot establish that the matters that the Union seeks to speak upon pose a harm to the operation of the KCFD or the actual government. Therefore, there is no lawful justification for the UG to have promulgated a policy that the Union could not speak at UG Public Safety Commission meetings or to elected officials, and the Union is likely to succeed on the merits of its First Amendment prior restraint claim.

### B. Plaintiff is Likely to Succeed on the Merits of its Content-Based Discrimination Claim.

The Union has also asserted a claim against Defendants for unlawful content-based discrimination in violation of the First Amendment, based on the Defendants' refusal to permit the Union and its members to speak before the Public Safety Committee. To determine whether a

government entity has violated a plaintiff's First Amendment right to free speech, courts apply the following three-tiered, forum-based test: 1) is the plaintiff's speech protected by the First Amendment? 2) what is the nature of the forum? and 3) do the government's justifications for limiting the plaintiffs' speech satisfy the requisite standard? *Scroggins v. City of Topeka*, 2 F. Supp. 2d 1362, 1368 (D. Kan. 1998) (citing *Summum v. Callaghan*, 130 F.3d 906, 913 (10th Cir. 1997)).

As explained above, the Union's speech is protected by the First Amendment. The operative question is therefore what type of forum the Public Safety Committee meetings are, and, by extension, what standard applies to the government's justifications for restricting the Union's speech at those meetings. "Generally speaking, the nature of the forum in which the speech is restricted dictates the level of scrutiny required." *Scroggins*, 2 F. Supp. 2d at 1370-71 (citing *United States v. Kokinda*, 497 U.S. 720, 726-27 (1990)). The Supreme Court has identified three types of speech fora: the traditional public forum, the designated public forum, and the nonpublic forum. *Verlo v. Martinez*, 820 F.3d 1113, 1129 (10th Cir. 2016) (citing *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 802 (1985)).

The recurring Public Safety Committee meeting is a designated public forum. A designated public forum is public property, not constituting a traditional public forum, which the government has intentionally opened to the public for expressive activity. *Id.* at 1129. Here, the UG has explicitly opened the Public Safety Committee meetings to the public for comment. And because the government seeks to exclude the Union from the otherwise open meeting space, its actions are subject to strict scrutiny. *Shero v. City of Grove*, 510 F.3d 1196, 1202 (10th Cir. 2007) (citing *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998)). *See Cornelius v. NAACP Legal Def. & Educ. Fund,* 473 U.S. 788, 800 (1985) ("When the Government has intentionally

11

designated a place or means of communication as a public forum speakers cannot be excluded without a compelling governmental interest.").

Thus, in a designated public forum, "the government may only impose content-neutral time, place, and manner restrictions that: (a) serve a significant government interest; (b) are narrowly tailored to advance that interest; and (c) leave open ample alternative channels of communication." *Shero*, 510 F.3d at 1203. Governments are allowed to impose restrictions that are designed to promote orderly and efficient meetings, such as time limitations on speech. *Id.*

The restrictions imposed by Defendants on the Union's speech fail to pass constitutional muster. Defendants' position that the Union may not speak regarding its concerns about fire fighter and public health and safety makes plain that the restriction is not neutral – it is the content of the Union's speech that Defendants takes issue with. And, as explained above, Defendants cannot demonstrate that this restriction serves a significant government interest, as their only rationale is based on the faulty premise that the Union's speech violates PEERA or some unstated and unknown privileged matter. Even if this rationale served a significant government interest, however, the restriction is far from narrowly tailored. While the UG could legitimately ask the Union to not speak on any privileged matters, it has instead issued a blanket prohibition on the Union's speech. Finally, the UG has not left open alternative channels of communication, as it has taken the position that Union members may not even speak directly with their Commissioners on these topics.

In an analogous case, the Fourth Circuit held that it was a violation of the First Amendment for a city council to prohibit a local union president from speaking at a council meeting about the wages and working conditions of his fellow employees while simultaneously opening the meeting to participation by other members of the public. *Local 2106, Int'l Assoc. of Fire Fighters, AFL-*

12

*CIO v. City of Rock Hill*, 660 F.2d 97 (4th Cir. 1981). The Court found that the city provided a public forum, and the city's policy of excluding the union from speaking before the forum was an impermissible content-based restriction on free speech. *Id.* at 100. *See also White v. City of Norwalk*, 900 F.2d 1421, 1425 (9th Cir. 1990) (city council meetings become public fora once they are opened to the citizens who thereby "have an enormous first amendment interest in directing speech about public issues to those who govern their city").

Likewise here, by opening the Public Safety Committee meetings up to the public for comment but excluding the Union from participating, the UG has imposed a content-based restriction on the Union's speech. And because this restriction is not narrowly tailored, it violates the First Amendment rights of the Union and its members. As such, the Union is likely to succeed on the merits of its content-based discrimination claim.

**C. The Harm to Plaintiff is Irreparable.**

Because Plaintiff has demonstrated that it is likely to succeed on the merits of its First Amendment claims, this Court must presume that its harm will be irreparable. *See Elrod*, 427 U.S. at 373 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *see also Ortega*, 148 F.4th at 1142. And even absent this presumption, Plaintiff has demonstrated that it will suffer irreparable injury if an injunction is not issued. The UG is set to finalize its budget for 2027 on September 1, 2026, and if the UG is allowed to continue denying the Union the right to speak, the budget will be approved without the Commissioners having the opportunity to consider the Union's health and safety concerns and how those concerns can be alleviated through the allocation of funds to the KCKFD.

II.   **The Harm to Plaintiff Outweighs the Harm Injunctive Relief Would Pose to Defendants.**

As explained above, when assessing whether a plaintiff bringing a First Amendment claim is entitled to injunctive relief, the "likelihood of success on the merits" element is "practically dispositive." *Wagner*, 2026 U.S. Dist. LEXIS 136961, at *2-3; *see also Verlo*, 820 F.3d at 1126. Even so, an evaluation of the third and fourth only bolsters the Union's claim that it is entitled to injunctive relief.

Turning to the third factor, whether the movant's threatened injury outweighs the injury the opposing party will suffer under the injunction, the demonstrable harm to Plaintiff plainly outweighs any injury to Defendants. "When a constitutional right hangs in the balance … even a temporary loss usually trumps any harm to the defendant." *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 806 (10th Cir. 2019) (internal citation omitted); *see also Vollmecke v. Indep. Sch. Dist.*, 2023 U.S. Dist. LEXIS 237540, *12 (W.D. Mo. Dec. 11, 2023) (citing *Rodgers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019)) ("The balance-of-equities analysis generally favors constitutional free speech.").

Further, the UG has not articulated – nor can it articulate – any actual injury; its only purported injury is a theoretical and unsubstantiated concern that the Union could divulge privileged information to the Commissioners. And, as this District has recognized, "[a]n illusory harm to the movant will not outweigh any actual harm to the non-movant." *Digital Ally, Inc. v. DragonEye Tech., LLC*, 2013 U.S. Dist. LEXIS 149374, at *29 (D. Kan. Oct. 17, 2013) (citing *Frank B. Hall & Co. v. Alexander & Alexander, Inc.*, 974 F.2d 1020, 1023 (8th Cir. 1992)). The balance-of-equities therefore tilts decidedly in the Union's favor and in favor of the issuance of injunctive relief.

14

### III.    The Issuance of Injunctive Relief Would Serve the Public Interest.

Finally, the issuance of injunctive relief to the Union would serve the public interest. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Verlo*, 820 F.3d at 1127; *see also Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005) ("Vindicating First Amendment freedoms is clearly in the public interest."). This principle is especially salient here, as the public also has a substantial interest in protecting the First Amendment rights of fire fighters to speak about the KCKFD's inadequate staffing and the resultant risk to the community it serves.

### CONCLUSION

All four factors the Court must assess when determining whether to grant a TRO and preliminary injunction weigh heavily in the Union's favor. As such, the Court should enjoin Defendants from enforcing the unconstitutional speech policy.

Dated: August 5, 2026                    Respectfully submitted,

                                         **GRISSOM MILLER LAW FIRM, LLC**

                                         */s/* Jake Miller
                                         Jacob Miller, KS #28337
                                         Grissom Miller Law Firm, LLC
                                         1600 Genessee Street, Ste. 460
                                         Kansas City, MO 64102
                                         T – 816-336-1213
                                         F – 816-384-1623
                                         jake@grissommiller.com
                                         *Counsel for Plaintiff*

                                         /s/ Tamara Y. Imam
                                         Tamara Y. Imam
                                         (*Pro Hac Vice application forthcoming*)
                                         Mooney, Green, Saindon, Murphy & Welch, P.C.
                                         1620 Eye Street NW, Suite 700
                                         Washington, DC 20006
                                         timam@mooneygreen.com
                                         *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that a true and complete copy of the foregoing was filed on this 5th day of August, 2026, with the Court's CM/ECF system, thereby providing service to all counsel of record. Additionally, a copy of this filing will be personally served along with the Verified Complaint on all Defendant's.

/s/ Jake Miller

*Attorney for the Plaintiff*

16